Counsel of Record:
ALEXANDER M. VASILESCU
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
Email: VasilescuA@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
**SECURITIES AND EXCHANGE COMMISSION,**                     :
                                                            :     **16 Civ. 3722  (   )**
                                   **Plaintiff,**           :
                                                            :     **COMPLAINT**
                   -against-                                :
                                                            :     **ECF CASE**
**WILLIAM T. WALTERS and THOMAS C. DAVIS,**                 :
                                                            :     **JURY TRIAL**
                                                            :     **DEMANDED**
                                   **Defendants,**          :
                                                            :
                   -and-                                    :
                                                            :
**THE WALTERS GROUP, NATURE**                               :
**DEVELOPMENT B.V., and PHILIP A. MICKELSON,** :
                                                            :
                                   **Relief Defendants.**   :
                                                            :
-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants William T. Walters ("Walters") and Thomas C. Davis ("Davis") (collectively,

"Defendants"), and The Walters Group, Nature Development B.V. ("Nature Development"), and

Philip A. Mickelson ("Mickelson") (collectively, "Relief Defendants"), alleges:

## SUMMARY

1.        This case involves repeated and very profitable insider trading by professional sports bettor William "Billy" Walters based on tips received from his long-time friend, Thomas C. Davis, a director of Dean Foods Company ("Dean Foods").  From 2008 through 2012, Davis tipped Walters with highly-confidential information concerning Dean Foods including sneak previews of at least six of the company's quarterly earnings announcements and advance notice of the spin-off of Dean Foods's profitable subsidiary, The WhiteWave Foods Company ("WhiteWave").  In 2013, Davis also provided Walters with inside information that Davis obtained from a group of investors who confidentially shared their plans to buy the stock of Darden Restaurants, Inc. ("Darden") with the goal of pushing the company to make corporate changes.  Based on these tips, Walters traded Dean Foods and Darden securities and reaped illicit trading profits and avoided losses totaling at least $40 million.

2.        In exchange for insider trading tips, Walters helped Davis with his financial problems by, among other things, providing Davis with almost $1,000,000.  In April 2010, Walters arranged for a friend to provide Davis with $625,000.  In November 2011, Walters provided Davis with an additional $350,000, money Davis needed to repay certain debts, including $100,000 Davis had wrongfully taken from a Dallas-based charity he managed that raised funds for a battered women and children's shelter.  Davis misappropriated the funds from the charity in August 2011 in order to finance the repayment of a gambling debt he owed to a Las Vegas casino.

3.        In July 2012, Walters called professional golfer Philip A. Mickelson.  Mickelson had placed bets with Walters both before and after July 2012 and owed Walters money at the time of the telephone call.  At a time when Walters was in possession of material nonpublic

2

information regarding Dean Foods, Walters communicated with Mickelson and urged Mickelson to trade in Dean Foods stock, which Mickelson did the next trading day in three brokerage accounts he controlled.  About one week later, Dean Foods's stock price jumped 40% on the announcements of the WhiteWave spin-off and strong second quarter ("Q2") 2012 earnings, allowing Mickelson to profit by approximately $931,000.

4.     By engaging in this scheme, Defendants have violated (and unless permanently enjoined and restrained, will continue to violate) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

5.     The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)  of the Exchange Act, 15 U.S.C. § 78u(d), seeking a final judgment:  (a) permanently restraining and enjoining Defendants from engaging in the acts, practices and courses of business alleged herein; (b) requiring Defendants and Relief Defendants to disgorge ill-gotten gains and to pay prejudgment interest thereon; and (c) imposing civil money penalties on Defendants pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.  In addition, the Commission seeks an order barring Davis from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and for such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21A, and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1, and 78aa.

7.      Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.  Defendant Walters engaged in many of the acts and transactions alleged herein through communications with broker-dealer representatives in this District and Deans Foods's and Darden's common stock trade on the New York Stock Exchange, which is headquartered in New York City.

## **DEFENDANTS**

8.      **Walters**, age 69, resides in Henderson, Nevada.  Walters is Chairman and CEO of The Walters Group.  By his own account, Walters is also a professional sports bettor.  From at least 2008, Walters received material nonpublic information about Dean Foods from Davis and then traded in the securities of Dean Foods.  On one occasion, at a time when Walters was in possession of material nonpublic information regarding Dean Foods, Walters communicated with Mickelson, with whom he was friends, and urged Mickelson to trade in Dean Foods stock.  Davis owed Walters money at the times he provided such information.  Similarly, Mickelson owed Walters money at the time Walters urged him to trade.  On at least one occasion, Davis provided Walters with material nonpublic information regarding Darden, and Walters used that information to trade.  During the Commission's investigation that preceded this action, Walters invoked his Fifth Amendment privilege against self-incrimination, refusing to produce documents or answer questions during sworn testimony.

9.      **Davis**, age 67, resides in Dallas, Texas.  Davis provided material nonpublic information about Dean Foods to Walters, to whom he owed money.  Davis obtained a

Bachelor's of Science in Aerospace Engineering from The Georgia Institute of Technology and a Master of Business Administration from Harvard Business School. At all times relevant to this action, Davis served on the board of directors of Dean Foods and was a member of the board's audit committee. Davis resigned from the Dean Foods board on August 7, 2015. In 2013, Davis was recruited to be part of a group of Darden shareholders who were seeking to bring about changes at that company and, despite being contractually obligated to keep the group's plans a secret, shared the information with Walters.

## RELIEF DEFENDANTS

10.    **The Walters Group** is a Nevada partnership owned by Walters and his wife and is based in Las Vegas, Nevada. In brokerage accounts held in the name of The Walters Group, Walters placed many of his illegal Dean Foods trades and all of his illegal Darden trades.

11.    **Nature Development B.V.** is a Netherlands private limited liability company based in Delft, Netherlands, which is 99% owned by a Nevada corporation controlled by Walters. Walters placed some of his illegal Dean Foods trades in brokerage accounts held in the name of Nature Development.

12.    **Philip A. Mickelson**, age 45, resides in Rancho Santa Fe, California, and is a successful professional golfer.

## RELEVANT ENTITIES

13.    **Dean Foods** is a Delaware corporation based in Dallas, Texas that distributes dairy products. Dean Foods's common stock is registered with the Commission under Section 12(b) of the Exchange Act and trades on The New York Stock Exchange under the symbol "DF."

14.     **WhiteWave** is a Delaware corporation primarily based in Denver, Colorado, that manufactures and distributes organic foods and beverages.  WhiteWave was a subsidiary of Dean Foods until Dean Foods spun it off in May 2013; the spin-off was publicly announced after the market closed on August 7, 2012.  WhiteWave's common stock is registered with the Commission under Section 12(b) of the Exchange Act and trades on The New York Stock Exchange under the symbol "WWAV."

15.     **Darden,** a Florida corporation based in Orlando, Florida, is a full-service restaurant company whose brands include Olive Garden, LongHorn Steakhouse, and The Capital Grille.  Darden's common stock is registered with the Commission under Section 12(b) of the Exchange Act and trades on The New York Stock Exchange under the symbol "DRI."

## FACTS

### A. Insider Trading in Dean Foods

16.     Walters and Davis first met more than 20 years ago at a Southern California golf course.  At the time, both owned homes in Southern California and met often to play golf.  In 2001, Davis retired from his position as managing partner and head of banking and corporate finance for the Southwest division of a national investment bank, and he joined the board of directors of Dean Foods.

17.     From at least June 2008, Davis conveyed to Walters, in words or in substance, material nonpublic information about Dean Foods, with the knowledge that Walters intended to use that information in order to profit.  Davis benefited from sharing the information with Walters.  Following his retirement from investment banking, Davis's financial condition declined, as his spending and gambling habits did not change despite his lower income.  He knew that it would be to his benefit to provide Walters with inside information about Dean

Foods, should he ever be in need of financial assistance, whether that be in the form of a gift, loan, business deal, or other potential gain of a pecuniary or similarly valuable nature. During the course of tipping Walters, Davis in fact reached out to and obtained financial assistance from Walters.

## I.   Dean Foods's Q2 2008 Earnings Update

18.   Before the market opened on June 25, 2008, Dean Foods announced it was raising its Q2 2008 earnings guidance from $0.26 to $0.31 per share to "at least $0.32 per share." That same day, the price of Dean Foods stock increased from the prior day's close of $18.39 to $20.12, approximately 9.5%, on the news, with trading volume approximately three and a half times that of the prior day. At the time, Dean Foods was not scheduled to release its Q2 2008 results until August 6, 2008.

19.   Davis knew that Dean Foods was performing ahead of expectations and, in words or in substance, provided this information to Walters. The two spoke after the market had closed on June 18, 2008. Before the market opened the next day, Walters called his broker and placed a buy order and, over the next three trading days, bought 3,358,216 shares of Dean Foods common stock in The Walters Group account and 600,000 shares of Dean Foods common stock in the Nature Development account at a total cost of $73.5 million. Walters's purchases ranged from approximately 29% to 37% of Dean Foods's daily trading volume on those days.

20.   When Davis and Walters spoke and when Walters bought Dean Foods stock, Dean Foods's Q2 2008 earnings information was material and nonpublic.

21.   As a result of the illicit trades Walters placed in advance of Dean Foods's Q2 2008 earnings guidance update, Walters generated more than $6 million in actual and unrealized trading profits after the updated guidance was announced to the public.

II.     **Dean Foods's Q4 2008 Earnings Release**

22.     Before the market opened on November 4, 2008, Dean Foods announced its earnings for the quarter ended September 30, 2008 (Q3 2008) and its stock price declined.  At this time, which was more than a month into Dean Foods's fourth quarter, Davis knew that the company was on track to meet its internal annual plan, which had more aggressive earnings targets than those Dean Foods had publicly shared.

23.     Davis called Walters just before the market closed on November 4 and, in words or in substance, tipped Walters.  At that time, Walters owned no shares of Dean Foods. Immediately after hanging up with Davis, Walters called his broker.  On November 5, Walters bought 574,083 shares of Dean Foods common stock in The Walters Group account for almost $9.8 million.  Walters continued buying Dean Foods common stock over the next several days, ultimately acquiring 1.5 million shares, a $24.2 million position.

24.     When Davis called Walters and when Walters bought Dean Foods stock, the company's internal targets and progression towards meeting them were material and nonpublic.

25.     On February 6, 2009, armed with the knowledge that Dean Foods had achieved outstanding financial results during Q4 2008, Davis called Walters and, in words or in substance, tipped Walters.

26.     On February 10, 2009, the day before Dean Foods announced its quarterly and year-end results, Walters bought an additional 300,000 shares of Dean Foods common stock in The Walters Group account for nearly $5.5 million.

27.     When Davis called Walters and when Walters bought Dean Foods stock, the company's Q4 2008 earnings results were material and nonpublic.

28.     Before the market opened on February 11, Dean Foods announced its earnings and its "highest adjusted quarterly operating income in its history."  Dean Foods's stock price increased to $19.59, a 7% increase from the prior day's close of $18.31, with trading volume approximately 50% higher than the prior day.  As a result of the illicit trades that Walters placed in advance of Dean Foods's 4Q 2008 earnings announcement, Walters generated $5.5 million in actual and unrealized trading profits.

**III.     Dean Foods's Q1 2010 Earnings Release**

29.     In April 2010, Davis was desperate for money and turned to Walters.  Davis asked Walters for a loan and, in the same meeting, provided Walters with confidential information regarding Dean Foods.

30.     In the days before this meeting, Davis learned that Dean Foods was going to have a special, off-site board meeting to discuss spinning off its WhiteWave subsidiary.  Management and the board believed that spinning off WhiteWave would unlock shareholder value and raise Dean Foods's stock price.  Davis arranged the meeting with Walters the day after learning of the special board meeting and flew to Las Vegas to meet with Walters four days later.

31.     As of Friday, April 9, 2010 – the day Davis met with Walters – Walters owned no Dean Foods shares.  On Monday, April 12, Walters purchased 1,000,000 shares of Dean Foods common stock in The Walters Group account for $16.8 million, constituting approximately 21% of the trading in Dean Foods's stock that day.  Two days later, Walters bought an additional 500,000 shares for $8.4 million in The Walters Group account, approximately 19% of the volume in Dean Foods's stock that day, and an additional 10,000 shares of Dean Foods in The Walters Group account on April 15, 2010.

32.     When Davis met Walters and when Walters purchased his 1,510,000 shares of Dean Foods common stock, Dean Foods's strategic plan to evaluate a spinoff of WhiteWave was material and nonpublic.

33.     On or about April 30, 2010, Davis learned that Dean Foods's Q1 2010 earnings results were weaker than the company had expected and that its annual forecast was bleak.   He obtained more information regarding the company's performance and increasingly pessimistic outlook on Sunday, May 2, 2010, during a telephone call with Dean Foods's CEO.   That evening, Davis and Walters communicated by telephone.   In words or in substance, Davis tipped Walters regarding Dean Foods's weak earnings and bleak forecast.

34.     At approximately market open on Monday, May 3, 2010, Walters's broker began selling every share of Dean Foods common stock held by The Walters Group and Nature Development.  All 510,000 shares held by The Walters Group were sold that day at $15.42; Nature Development's 1,000,000 shares were sold by close of market the following day (at $15.42 on May 3 and $15.19 on May 4).  Walters's trading on May 3 accounted for approximately 29% of Dean Foods's trading volume that day; his May 4 trading accounted for approximately 16% of Dean Foods's trading volume.

35.     When Davis called Walters and when Walters sold his Dean Foods stock, the company's Q1 2010 earnings information was material and nonpublic.

36.     On May 10, the day Dean Foods reported its disappointing Q1 2010 earnings and suspended its full year guidance, the stock closed at $10.47, down about 30% from its prior trading day's closing price of $14.63, on volume almost 12 times that of the prior trading day's volume.  By selling on May 3 and 4, Walters was able to avoid approximately $7.3 million in losses.

### IV.     Dean Foods's Q3 2010 Earnings Release

37.     Walters bought 1,500,000 shares of Dean Foods common stock in The Walters Group account between October 4 and 7, 2010, at a cost of $15.8 million.

38.     Davis learned on or about October 18, 2010 that Dean Foods would report disappointing results for the third quarter.  The Dean Foods board met that day, and management previewed the lower than expected results for the board.

39.     At approximately 2:40 p.m. Central on October 21, 2010, Davis spoke to Walters by telephone.  Davis, in words or in substance, tipped Walters regarding the lower than expected results for Dean Foods.  Immediately after speaking with Davis, Walters called his broker and sold 400,000 Dean Foods shares in the final 20 minutes of trading.  He sold his remaining 1,100,000 Dean Foods shares the next day, October 22.  Walters's trades on October 22 accounted for approximately 30% of Dean Foods's trading volume that day.

40.     When Davis called Walters and when Walters sold his shares of Dean Foods common stock, the company's Q3 2010 earnings information was material and nonpublic.

41.     On November 9, the day Dean Foods reported its Q3 2010 disappointing earnings, the share price declined 18%, from $10.36 to $8.50, on nearly ten times the prior day's volume.  By selling on October 21 and 22, Walters was able to avoid approximately $2.2 million in losses.

### V.     Dean Foods's Q2 2012 Earnings Release and Announcement of the WhiteWave Spin-off

#### (i)     Davis Tips Walters, Who Trades in Dean Foods

42.     Two years later, Dean Foods renewed efforts to spin off WhiteWave.  On or about Friday, May 4, 2012, the Dean Foods CEO emailed Davis and the other directors a presentation regarding the audit committee and board conference call scheduled for Tuesday, May 8, 2012.  The CEO told the board that the "[t]ime is right to separate the business" of its WhiteWave

subsidiary in light of, among other factors, the strong Q1 2012 earnings the company would report on May 9.  Management also emphasized that they needed to "[m]ove as quickly as possible to capitalize on current conditions."  The directors were told this information was confidential and were instructed to "not share these materials with anyone inside or outside of the Company."

43.     The May 8 conference call began at or about 11:00 a.m. Central.  Davis dialed into the call from his exclusive golf country club.  The board heard from the CEO and then charged management to proceed with the spin-off, believing the market undervalued Dean Foods and that separating WhiteWave would unlock shareholder value and raise the Dean Foods stock price.

44.     Davis communicated, in words or in substance, the above material nonpublic information to Walters.  On May 8, three minutes after hanging up from the conference call, Davis called Walters.  Nine minutes later, Walters called his broker.  Approximately two minutes later, an order to purchase 1,500,000 shares of Dean Foods common stock for The Walters Group account was entered into the brokerage firm's order system.  The firm filled part of the order on May 8: The Walters Group purchased 803,260 shares at $12.34 per share for a total of $9.9 million, which accounted for 12.5% of Dean Foods's trading volume that day.



May 8, 2012

45.     Before the market opened on May 9, Walters called his broker.  The Walters Group purchased an additional 396,740 shares of Dean Foods common stock that day.

46.     By July 2012, Dean Foods had made substantial progress on the WhiteWave spin-off.  Management had advised the board that it was on track to file an S-1 Registration Statement with the Commission on the company's target date of August 7, 2012.  The board had created a committee to put together the slate of officers and directors staying with Dean Foods, and a corresponding slate going to WhiteWave, having tapped Davis as the new chairman of the board for the surviving Dean Foods entity.  The compensation committee, on which Davis sat, was working with outside consultants on executive and director compensation for the two companies. Dean Foods's unreported second quarter earnings (which needed to be strong enough to support the spin-off) were strong.  Dean Foods's work on the WhiteWave spin-off and its as-yet unreported Q2 2012 earnings were material and nonpublic.

47.     Throughout July, Davis communicated, in words or in substance, Dean Foods's progress on the WhiteWave spin-off and its Q2 2012 earnings to Walters, often using a prepaid cellular phone that Walters had provided.  He also used the secret code Walters had dictated. When Walters gave Davis the prepaid phone, Walters said that when either of them wanted to discuss Dean Foods, he should refer to the company as the "Dallas Cowboys."  Walters often used prepaid phone numbers for these communications.

48.     On July 13, 2012, Walters purchased 800,000 shares of Dean Foods common stock in The Walters Group account at $14.38 per share.  Walters placed an order to buy an additional 1,000,000 shares of Dean Foods common stock in The Walters Group account, which was filled on July 17 and 18.  On July 23 and 24, Walters bought another combined 900,000

shares of Dean Foods common stock (425,000 shares in The Walters Group account and 475,000 shares in the Nature Development account).

49.     On or about Wednesday, July 25, 2012, Davis and the other directors on the Dean Foods compensation committee met to further discuss the officer and director compensation of the two companies.  Davis communicated, in words or in substance, that material nonpublic information to Walters.  On July 26, Davis texted Walters three times, and Walters called Davis four minutes later.  Davis and Walters texted each other over the weekend, and Walters called Davis on Monday, July 30.  Davis also stayed with Walters at one of his homes in Southern California beginning that day.  During his stay, Davis provided Walters with another positive update on the status of the spin-off.  On July 31, Walters bought an additional 100,000 shares of Dean Foods common stock in The Walters Group account.

50.     As a result of these July trades, Walters increased his holdings of Dean Foods stock from 1,200,000 shares to 4,000,000 shares, a position that cost in excess of $52,700,000.

### (ii)     Walters Tips Mickelson, Who Trades in Dean Foods

51.      In addition to trading based on the material nonpublic information that he received from Davis, Walters sought to obtain additional benefits by tipping his friend, Mickelson, to buy Dean Foods securities.  On Friday, July 27, Walters called Mickelson.  The two exchanged text messages later that day, and again on July 28, 2012.

52.     On Monday, July 30 and Tuesday, July 31, Mickelson bought, partially on margin, a total of 200,240 Dean Foods shares, a $2.4 million position, in three accounts he controlled.  This position dwarfed the other holdings in the brokerage accounts, which collectively were valued at less than $250,000.  Mickelson had not been a frequent trader and these were his first ever Dean Foods purchases.

### (iii)   Walters and Mickelson Profit From Their Dean Foods Trades

53.     When Dean Foods announced the WhiteWave spin-off and Q2 2012 earnings results after the close of market on August 7, 2012, its stock price increased 40% from a close of $12.42 per share on August 7, 2012 to close at $17.46 per share on August 8, 2012.  This share price increase occurred on a trading volume more than five times greater than the prior day's volume.

54.     As a result of the illicit trades that Walters placed in advance of Dean Foods's announcement of the WhiteWave spin-off and Q2 2012 earnings results, Walters generated more than $17.1 million in unrealized trading profits.

55.     On August 8, Mickelson sold all the Dean Foods shares he had purchased on July 30 and July 31, realizing a total profit of approximately $931,000.

## VI.   Dean Foods Announces the Offering Price for WhiteWave's Shares

56.     After August 7, 2012, Dean Foods undertook steps to complete the spin-off of WhiteWave through an initial public offering ("IPO") of WhiteWave shares.  Davis, along with the other board members, was kept apprised of the progress of the spin-off.  Information to which he, along with other board members, was privy included how the investor road show was going and the price at which the WhiteWave shares would be offered.

57.     Walters and Davis communicated, using prepaid phones, throughout September and October 2012 to discuss the "Dallas Cowboys."  In these communications, in words or substance, Davis tipped Walters regarding the price at which WhiteWave shares would be offered. Walters then purchased more shares of Dean Foods common stock, buying 500,000 shares for $8.2 million in The Walters Group account between September 17 and 19.  Walters bought an additional 315,953 shares for $4.7 million in that account on October 9 and 11.

58.     When Davis and Walters communicated, and when Walters purchased these shares of Dean Foods common stock, the price at which WhiteWave's IPO would be offered was material and nonpublic.

59.     On October 17, 2012, Dean Foods announced that its wholly-owned subsidiary WhiteWave had filed an amended registration statement with the Commission.  In that filing, the offering price for the WWAV IPO shares was listed as between $14 and $16.  Dean Foods's stock price increased more than 12.5% on the news with trading volume almost seven times the volume on the prior day.  As a result of the illicit trades Walters placed in advance of Dean Foods's announcement of the WhiteWave IPO share price, Walters generated $887,000 in unrealized trading profits.

**B.  Insider Trading in Darden**

60.     During the summer of 2013, Davis was approached by a shareholder group that was buying stock of a certain code-named target company with the goal of pushing the company to make corporate changes.  On or about July 31, 2013, Davis signed a Non-Disclosure Agreement ("NDA") in which Davis agreed that he would keep confidential information he received from the shareholder group, including their plans for the company.  Davis also agreed in the NDA that he would not cause any other person to acquire securities of the target company.

61.     After signing the NDA, Davis received a presentation from the shareholder group, which identified the target company as Darden and laid out the group's strategic plans for Darden.  Davis further learned that the shareholder group had begun purchasing shares of Darden with a goal of accumulating an 8-9% interest in the issuer and thereafter urging certain corporate changes in the group's role as an activist shareholder.  The presentation was marked "Confidential" and the cover page used the code name "Project Dee."

62.     Davis, in words or in substance, tipped Walters regarding this shareholder group's information concerning Darden.  On or about August 6, 2013, Davis met with a representative of the shareholder group, called Walters, and then mailed the confidential presentation to Walters. Although Davis had an electronic version he could have forwarded by email to Walters, Davis instead traveled to a postal center and used cash to pay for the mailing.

63.     The information Davis provided to Walters about Darden and the shareholder group's plans was material and nonpublic.  When Davis provided information about Darden and the shareholder group's plans to Walters, he did so in breach of his duty of confidentiality to the shareholder group.  Walters knew, or recklessly disregarded, that Davis breached such duty by providing him with the information.

64.     After receiving the information from Davis, Walters traded in Darden, purchasing 535,200 shares of Darden in The Walters Group account for $25.7 million on August 20, 2013. Walters purchased another 89,800 Darden shares in that account for $4.2 million the following day.  Walters has never purchased Darden securities at any other time.

65.     On October 9, 2013, the Wall Street Journal ran an article titled "Activist Pushes for Split of Darden Restaurants" and named the investor group into which Davis had been recruited.  The stock rose 7% on the news, with volume increasing from 2.7 million shares the prior day to 12.58 million shares.  As a result of the illicit trades Walters placed in advance of the shareholder group's plan becoming public, Walters generated approximately $1 million in unrealized trading profits.

**C. Davis Benefited By Tipping Walters**

66.     Davis's tips to Walters were of value to Davis.  Throughout 2008 and 2009, Davis's financial condition was deteriorating.  He provided Walters with material nonpublic

17

information relating to Dean Foods because he believed that doing so would inure to his financial benefit at a later date.  That date came on April 9, 2010 when Davis met with Walters and asked him for a $625,000 loan.  At that time, Davis needed money and he needed it fast.  He owed the Internal Revenue Service ("IRS") $78,000, was carrying tens of thousands of dollars in credit card debt, and had heavily margined his brokerage account.  Davis also owed over $550,000 to an investment fund he managed.  Not having the money to pay the IRS or maintain his lifestyle, Davis turned to Walters for help.

67.     Two days after the April 9, 2010 meeting with Davis, Walters spoke with a long-time friend of his, whom Davis had never met and still has not met, and arranged for that friend to wire $625,000 to Davis.  On April 12, Walters purchased 1,000,000 shares of Dean Foods common stock.

68.     Less than a month after receiving the funds, Davis warned Walters about Dean Foods's financial results and pessimistic outlook.  On or about May 2, 2010, Davis knew, or had reason to know, that Walters had purchased Dean Foods securities after their April 9 meeting and Davis knew that Dean Foods would soon report weak financial results and suspend its full year guidance.  As alleged in paragraphs 33-35 above, Davis called Walters to warn him about the yet-to-be public earnings and forecast.  Walters liquidated his Dean Foods position before the company publicly announced the news and avoided $7.3 million in trading losses.

69.     In November 2011, Davis returned to Walters for more money.  This time, he needed an additional $350,000 to repay substantial personal debts.  He owed $178,000 on a business venture to operate a private jet.  He also owed $100,000 to a charitable organization he managed, having wrongfully taken that amount from the charity to cover a gambling debt owed to a Las Vegas casino.

70.     Davis suffered $200,000 in gambling losses at the casino in March 2011 but had repaid less than half by May.  On or about August 26, 2011, the casino cashed $100,000 of Davis's markers – the legal tender representing credit the casino had extended to Davis – as he had failed to repay the debt.  The cashing of the markers caused Davis's checking account balance to drop to almost negative $80,000.  The next business day, Davis instructed his assistant to write him a check for $100,000 from the bank account of the charity he runs to raise money for a Dallas-based shelter for battered women and children, and to deposit the check into his personal checking account.  Davis kept his personal use of the charity's funds a secret from the charity's other trustees and its donors.

71.     This $100,000 check resulted in a significant shortfall in the amount available for donation to the battered women's shelter.  Davis first delayed the charity's donation to the shelter and later wrote a check for a partial amount only after prompting by the shelter leader and promising another $100,000 by the end of the shelter's fiscal year (October 31).

72.     In order to repay the charity and get the shelter its money, Davis went back to Walters and asked for more money.  In early November 2011, Walters transferred a total of $350,000 to Davis, papering this transfer as a line of credit personally guaranteed by Davis.  On November 7, 2011, the day a $300,000 wire from Walters arrived in his account, Davis returned $100,000 to the charity and paid the amount he owed on the private jet venture.

73.     Walters funded Davis, despite the fact that Davis had proven himself a huge credit risk.  Well before November 2011, Davis had stopped making payments to the long-time friend of Walters who had transferred him $625,000 in April 2010, as arranged by Walters.  Indeed, The Walters Group repaid that friend $646,954.38 (the $625,000 principal plus accrued interest)

in January 2012, using funds provided by Walters personally. Thus, by early 2012, Walters had extended almost $1,000,000 to Davis.

74.     Throughout 2012, while Davis continued to provide Walters with material nonpublic information regarding Dean Foods, Walters made no attempts to collect even a penny of the funds that he had directly and indirectly provided to Davis.

75.     In August 2013, Davis disclosed to Walters the secret plans of the investor group targeting Darden, further keeping any debt collection efforts at bay.

**D.  Walters Benefited By Tipping Mickelson**

76.     Walters's tip to Mickelson was of value to Walters. Mickelson had placed bets with Walters prior to the tip, and Mickelson owed Walters money at the time of the Dean Foods trading. Mickelson repaid Walters in September 2012, in part with the proceeds of his trading.

**E.  Davis And Walters Acted With Knowing or Reckless Scienter**

77.     Davis and Walters were each aware of important legal prohibitions against insider trading.

78.     As a member of Dean Foods's board of directors, Davis had, and knew that he had, a duty to maintain the confidentiality of information he obtained by virtue of his position of trust and confidence. As to Darden, Davis signed an NDA, promising to hold all information learned from the shareholder group in connection with its strategic plan confidential and not to trade or tell others to trade Darden securities.

79.     Walters knew, had reason to know, or recklessly disregarded, that Davis, as a member of the board of Dean Foods, could not legally tip him with material nonpublic information about Dean Foods. He further knew, had reason to know, or recklessly disregarded, that the information Davis tipped to him about Darden, including the presentation Davis sent

him, which was marked "Confidential," was material nonpublic information that Davis could not legally share with him.

80.     The information that Davis obtained from Dean Foods and tipped to Walters concerning Dean Foods's (i) June 25, 2008 earnings announcement, (ii) February 11, 2009 earnings announcement, (iii) May 10, 2010 earnings announcement, (iv) November 9, 2010 earnings announcement, (v) August 7, 2012 earnings announcement, (vi) August 7, 2012 spin-off announcement, and (vii) October 17, 2012 announcement of the pricing of WhiteWave IPO shares was, in each case, material and nonpublic.

81.     The information that Davis obtained from the shareholder group and tipped to Walters concerning the shareholder group's existence and strategic plans for Darden was material and nonpublic.

82.     Davis breached a fiduciary duty, or other relationship of trust or confidence, by providing material nonpublic information to Walters, and Davis knew, had reason to know, or recklessly disregarded, that the information he conveyed was material and nonpublic.

83.     Davis received a benefit from tipping Walters.  Walters knew, had reason to know, or recklessly disregarded, that Davis received a benefit from tipping him.

84.     Walters knew, had reason to know, or recklessly disregarded, that the information obtained from Davis concerning Dean Foods's (i) June 25, 2008 earnings announcement, (ii) February 11, 2009 earnings announcement, (iii) May 10, 2010 earnings announcement, (iv) November 9, 2010 earnings announcement, (v) August 7, 2012 earnings announcement, (vi) August 7, 2012 spin-off announcement, and (vii) October 17, 2012 announcement of the pricing of WhiteWave IPO shares was, in each case, material and nonpublic.

85.     Walters knew, had reason to know, or recklessly disregarded, that the information obtained from Davis regarding the shareholder group's strategic plans for Darden was material and nonpublic.

86.     Walters also knew, had reason to know, or recklessly disregarded, that such information was conveyed, in each case, in breach of a fiduciary duty or similar relationship of trust or confidence.

87.     Walters is responsible for the trading occurring in The Walters Group and Nature Development accounts because he effectuated the trades and controlled the accounts.

88.     Walters inherited Davis's duty to maintain the confidentiality of information that Davis obtained by virtue of his position of trust and confidence at Dean Foods.

89.     Walters breached this inherited duty by engaging in the tipping alleged above in paragraphs 51 through 53.

### FIRST CLAIM FOR RELIEF
**(Violations of Section 10(b) of the Exchange Act and Rule
10b-5 Thereunder Against Both Defendants)**

90.     The Commission realleges and incorporates by reference paragraphs 1 through 89, as though fully set forth herein.

91.     By virtue of the foregoing, both of the Defendants, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce,  or of the mails,  or a facility of a national securities exchange, directly or indirectly, with scienter have:

    i.     employed devices, schemes and artifices to defraud;

    ii.    made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    iii.    engaged in acts, practices and courses of business which operated or would operate as a fraud and deceit upon any person in connection with the purchase or sale of any security.

92.    By virtue of the foregoing, Defendants, and each of them, directly or indirectly, violated and, unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### SECOND CLAIM FOR RELIEF
**(Equitable Claim Against All Relief Defendants)**

93.    The Commission realleges and incorporates by reference paragraphs 1 through 89, as though fully set forth herein.

94.    Relief Defendants The Walters Group, Nature Development, and Mickelson each received gains from trades based on material nonpublic information, over which they each have no legitimate claim.

95.    Relief Defendants The Walters Group, Nature Development, and Mickelson received the gains described above as part of, and as a consequence of, the securities law violations by Defendants Walters and Davis described above, under circumstances in which it is not just, equitable, or conscionable for them to retain the funds.

96.    By reason of the foregoing, Relief Defendants The Walters Group, Nature Development, and Mickelson have been unjustly enriched and must disgorge the amount of their ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Defendants, and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder;

### II.

Ordering Defendants and Relief Defendants to disgorge all ill-gotten gains received as a result of the conduct alleged in this Complaint, including all ill-gotten gains in the form of illicit trading profits and illicit losses avoided and all ill-gotten gains in the form of illicit trading profits and illicit losses avoided of the Defendants' respective tippees (including Relief Defendants), plus prejudgment interest thereon;

### III.

Ordering that Defendants be held jointly and severally liable for such disgorgement and prejudgment interest;

### IV.

Ordering Defendants to pay civil money penalties pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1; and

### V.

Barring defendant Davis pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from acting as an officer or director of any issuer that has a class of securities

registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file

reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and for such other

relief as the Court may deem appropriate.

### VI.

Granting such other and further relief as this Court deems just and appropriate.

Dated: May 19, 2016
New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
     Alexander M. Vasilescu

200 Vesey Street, Suite 400
New York, New York 10281-1022
Tel:   (212) 336-0178
Email: VasilescuA@sec.gov

Attorneys for Plaintiff

Of Counsel:
Karen Kreuzkamp*
Victor W. Hong*
William J. Martin
Joseph Sansone
Jina L. Choi

*Not admitted in SDNY but admitted in
N.D. Cal. and California.